**No. 26-14027-P**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

JESSE GUARDADO,

Plaintiff-Appellant,

v.

SECRETARY, DEPARTMENT OF CORRECTIONS,
WARDEN, FLORIDA STATE PRISON,

Defendants-Appellees.

---

On Appeal from the United States District
Court for the Middle District of Florida

---

# EMERGENCY MOTION FOR STAY OF EXECUTION

---

***** EXECUTION SCHEDULED FOR NOVEMBER 5, 2026, 6:00 P.M. *****

LINDA MCDERMOTT
Chief, Capital Habeas Unit
SEAN GUNN
Assistant Federal Public Defender
Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

*Guardado v. Secretary, Florida Department of Corrections, et al.* **No. 26-14027-P**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

**Interested Persons:**

Cobb, Jason (Trial Co-Counsel)

Comerford, Richard (Defendant-Appellee)

Ellicott, Bailey (Counsel for Plaintiff-Appellant)

Elmore, Robert (Trial Prosecutor)

DeBelder, Joseph (Federal Public Defender)

Gontarek, John Jay (Trial Counsel)

Guardado, Jesse (Plaintiff-Appellant)

Gunn, Sean (Counsel for Plaintiff-Appellant)

Harrington, Mary (Counsel for Plaintiff-Appellant)

Hinkle, Robert (Federal District Judge)

Howard, Marcia Morales (Federal District Judge)

Love, J. Ryan (State Circuit Judge)

Malone, Jackie (Victim)

McClain, W.C. (Direct Appeal Counsel)

McDermott, Linda (Counsel for Plaintiff-Appellant)

Millsaps, Charmaine (Counsel for Defendant-Appellee)

Moore, Karin (State Postconviction Counsel)

Polk, Randall (Defendant-Appellee)

Rodriguez, Jason (Counsel for Defendant-Appellee)

Taylor, Clyde Jr. (State Postconviction Counsel)

Uthmeier, James (Florida Attorney General)

Ward, Michelle (Counsel for Plaintiff-Appellant)

Wells, Kelvin (State Circuit Judge)

**Corporate Disclosure:** N/A

# EMERGENCY MOTION FOR STAY OF EXECUTION

## I. Introduction

On September 28, 2026, Jesse Guardado filed a 42 U.S.C. § 1983 complaint regarding Florida's maladministration of its lethal-injection protocol. MDFL-ECF 1. Guardado's complaint noted that it was filed "before any death warrant issued to allow for meaningful judicial review" of the facts and allegations presented. *Id.* at 4, 36. One week later, Guardado's death warrant was signed.

Truncated proceedings followed, including a hearing where Guardado presented significant evidence of Defendants' maladministration of the protocol. That evidence, much of which Defendants could not explain or rebut, shows that Guardado's claim has at least a substantial likelihood of success on the merits.

In crediting the Defendants' evidentiary proffer, the district court overlooked important facts concerning Guardado's claim, discounting that the Defendants' error-prone approach compounds the protocol's inherent dangers that risk the substantial harms this Court recently deemed unconstitutional in *Lee v. Comm'r, Ala. Dep't of Corr.*, No. 26-11864, 2026 WL 1651147 (11th Cir. Jun. 8, 2026).

A stay is warranted to allow for further proceedings and to give due consideration to the serious and complex issues presented. Guardado's substantial claim should not be rushed to completion or allowed to be mooted by his execution,

particularly when the State created this exigency. This Court should stay Guardado's execution to allow for further proceedings.

## II. Guardado's claim must be viewed in the context of the riskiness of Florida's lethal injection protocol and the recently revealed problems with its implementation

### A. Defendants' three-drug protocol and an insufficient snapshot of awareness

The district court missed the broader picture that Defendants' poorly documented and sloppy approach to carrying out the protocol increases the likelihood of torture given the procedure's design.

FDOC's protocol calls for three drugs to be administered: etomidate, rocuronium bromide, and potassium acetate. None have analgesic properties. EH 19. The first drug, etomidate, is a short-acting, non-barbiturate, hypnotic drug, used for the induction of general anesthesia and sedation. MDFL-ECF 1-7 at 4. During the hearing, Dr. Almgren, an expert in pharmacology and pharmaceutical ethics, explained that etomidate induces a short timeframe of unconsciousness, three to five minutes, that is not lengthened by the massive dose given. EH 21. At most, the large dose of etomidate may impact the *depth* of unconsciousness, but not its duration. EH 21-22. Dr. Zivot, a practicing anesthesiologist and professor of anesthesiology and surgery, EH 83-84, concurred and explained that, due to the way etomidate works, "simply adding more" has no effect. In other words, the dose does not increase the length of time in which the drug induces hypnosis. EH 90.

The second drug, rocuronium bromide, is a "long-acting" drug, EH 124, that specifically paralyzes the skeletal muscles, including the diaphragm, making it impossible to move or breathe. EH 93-94. Both parties' anesthesiology experts testified during the evidentiary hearing that a paralytic drug, when administered to a conscious person, induces a nearly identical death to the air-hunger at issue in *Lee*: if a prisoner were to "find themselves paralyzed and unable to move and be fully awake, it would be a terrifying experience. It would be suffocation." EH 94 (Plaintiff's expert); *see also* EH 75 (Defendants' expert).

Compounding the already substantial risk of serious pain, Defendants record a consciousness check taking just one minute or less by a non-medical execution team member. MDFL-ECFs 33-1 at 9; 33-2 at 6; 33-3 at 12; 33-4 at 8; 33-5 at 7. Without a potent dose of etomidate, there is an increased likelihood that prisoners will feel the sensations of the paralytic drug. The "consciousness check is a singular and ineffective method to determine what it sets out to determine." EH 130. This is in part because "the consciousness check is done as a single moment, not in a continuous way." EH 124; *see, e.g.*, MDFL-ECF 33-1 at 6.

Moreover, the very design of the three-drug protocol interferes with an accurate assessment of consciousness. As Zivot testified, "once [FDOC has] given the paralytic, of course, you have no way of knowing whether or not they are aware or not." EH 107. "And there's no investigation of that. . . . So, you know, it creates

this serious opportunity for a situation where there could very well be some awareness and there would be no way of knowing it." EH 107.

The record reflects that Defendants' anomalous three-drug protocol and flawed consciousness checks create an already hazardous situation even before considering the added danger that could result from Defendants' documented and routine maladministration. As this Court recognized in *Lee v. Comm'r Ala. Dep't of Corr.*, a protocol inflicting "one to three minutes of 'severe air hunger and corresponding emotional distress, anxiety, physiological stress, and physical discomfort[,]'" No. 26-11864, 2026 WL 1651147 at * 7, 'presents a substantial risk of serious harm'—severe pain over and above death itself[,]'" *id.* at *6 (cleaned up). This Court's findings concerning Alabama's nitrogen hypoxia protocol are analogous here. The district court failed to consider Guardado's argument that Defendants' recurrent, pervasive, and barely-rectified maladministration places prisoners, already subject to a precarious protocol, at a significantly higher risk of severe pain and suffering, compounded by psychological torture given the high likelihood of awareness.

### B. Defendants' records demonstrate a significant risk of harm

None of the problems raised in Guardado's § 1983 complaint, based on a fraction of FDOC's own drug records that showed multiple serious, systemic problems discussed herein, presented an "if-then" scenario or were speculative, but

instead demonstrated concrete evidence of an objectively intolerable risk of harm. *See Ferguson v. Warden, Fla. St. Prison*, 493 F. App'x 22, 25 (11th Cir. 2012). This Court should intervene to properly consider Guardado's claim within the greater context of the harm that could arise from FDOC's pattern of protocol violations.

**1. Failure to log the removal of etomidate**

The district court's conclusion, based largely on an in-camera review of information Guardado has never seen, MDFL-ECF 63 at 37, that in none of the six instances where Defendants documented the administration of expired etomidate was the etomidate actually expired, should be reversed for two reasons: (1) flaws within Defendants' recordkeeping standards still call into question the quantity and potency of the etomidate administered; and (2) Defendants' inability to explain or rectify internal recordkeeping errors calls into question a flawed system that creates a pervasive danger of substantial pain during an execution.

First, the district court did not account for remaining errors in Defendants' prior administration of etomidate. While the court found that the etomidate used during the executions in question was not expired, that finding did not resolve other discrepancies.[1] For example, there was no documented removal of etomidate for the

[1] To the extent the district court dismissed Guardado's reliance on the unexplained tenfold disparity in postmortem etomidate levels, MDFL-ECF 63 at 41, that contradicted the court's own reliance on those levels to find that the inmates received etomidate. The court's review also did not resolve the greater concern that there is no documentation of the amount, or potency, of etomidate administered to

July 15, 2025, execution of Michael Bell, MDFL-ECF 48-2 at 26; EH 258, or for the June 24, 2025, execution of Thomas Gudinas. Instead, there is a noted removal of 50 vials of etomidate with a June 30, 2025, expiration date on June 25—seemingly, the removal of drugs set to expire. MDFL-ECF 48-8 at 8.

During the evidentiary hearing, Dr. Marcano could only assume that etomidate was used during Gudinas's execution. EH 255. But Marcano had no proof, merely stating that "the execution could not have occurred without it," and that "the folks that are involved with the team at that site, they're very methodical." EH 255.

Defendants' logs also do not reflect a documented removal of etomidate corresponding with the July 31, 2025, execution of Edward Zakrzewski. EH 40. The logs instead contain two entries: one showing the removal of 10 vials on July 28, 2025, and the other showing the removal of 20 vials on August 1, 2025, both with an expiration date of July 31, 2025. MDFL-ECF 48-8 at 8. At best, the logs indicate the drugs were removed three days *before* the Zakrzewski execution, which occurred on the date of expiration for the etomidate. However, such speculation contradicts Marcano's testimony about how and when drugs are removed and logged. MDFL-ECF 48-8 at 8. As Marcano explained, the subsequent removal of 20 vials of etomidate on August 1, 2025, was the removal of expired drugs. EH 252.

---

Michael Bell, Thomas Gudinas, or Edward Zakrzewski. The district court did not acknowledge that broader question was still unresolved. *See id.* at 44.

Second, and unacknowledged by the district court, is the systemic failure within FDOC that allowed these errors to occur in the first place. The district court acknowledged these gaps in explanation by conducting its own investigation through review of unredacted drug logs and invoices Guardado has never seen. MDFL-ECF 63 at 24-25. As noted, Marcano was incapable of providing answers for any of these discrepancies. Contributing to the inability to explain the discrepancies was the description of a "worksheet" that is prepared when removing drugs but then later inexplicably destroyed. EH 231. "[W]e just don't keep the worksheet." EH 231. Without the worksheet, there is no contemporaneous paper trail providing the actual dates, quantity, and lot information for each vial removed from the pharmacy, and no way to audit that information later. Marcano explained that when she asked the execution team about the discrepancies in the logs, "they did not refer to notes," EH 259, but rather answered her questions from memory.

The district court's crediting of Marcano's testimony, based on its own in-camera review, does not resolve the remaining factual questions that need to be considered before Guardado's execution. The district court acknowledged that Defendants' drug logs contain a "concerning number of errors" and "poor record keeping," MDFL-ECF 63 at 43, while simultaneously crediting Marcano's unresponsive testimony on the topic. This was improper given the factual development during the hearing.

### 2. Documented removal of insufficient dosages of drugs

Defendants' logs also show dosages of drugs administered during multiple other executions which are inconsistent with the protocol, including removing only 7 of the required 12 vials of potassium acetate for the execution of Anthony Wainwright on June 10, 2025, MDFL-ECF 48-8 at 22, and only half of the required 20 vials of rocuronium bromide for the execution of Thomas Gudinas on June 24, 2025. MDFL-ECF 48-8 at 13. These concerns were not sufficiently addressed by the district court, which credited Marcano's intervention even though she was unable to provide explanations for these violations or adequate reassurance that they would not recur. MDFL-ECF 63 at 23. The court improperly accepted the excuse that Marcano had not yet taken the position as Bureau Chief, without making any findings of fact. *Id.*

Defendants' records show that 7 vials of potassium acetate were removed on June 12, 2025, two days after the Wainwright execution. EH 32. Marcano "wasn't able to resolve why that says negative 7" instead of the appropriate removal of 12 vials. EH 239. Similarly, Gudinas was executed on June 24, 2025. EH 246. The logs do not reflect any removal of potassium acetate until 17 vials were withdrawn on June 25. MDFL-ECF 48-8 at 22.

Further acknowledging that only half of the required dosage for rocuronium bromide was withdrawn for the Gudinas execution on June 24, EH 245, Marcano

could only answer that "[i]t is not clear to me what happened on that entry." EH 246. As Almgren pointed out, that is precisely the issue. Marcano should be able to explain what happened on each execution date, even those before her tenure, based on reading the records. Instead, Marcano testified she felt confident the accurate dosage was given because "I know the process. I know the transporters." EH 240. She admitted that conclusion was not based on an objective investigation. EH 240.

Overlooked by the district court is that each dosage is mandated by the protocol for a specific reason, and an insufficient dosage of one drug could lead to unnecessary suffering from another. For example, because etomidate is an ultrashort acting sedative, an insufficient dosage of potassium acetate would lead to a drawn out, torturous death by the paralytic while the inmate is aware. A failure to consider these errors within the broader context of the protocol was improper and leaves a critical portion of Guardado's maladministration claim unresolved. As the Supreme Court noted in *Baze*, 553 U.S. at 53, an improper dose of a sedative drug could yield "a substantial, constitutionally unacceptable risk of suffocation from the administration of [the subsequent two drugs]." Here especially, due to etomidate's uniquely fast-acting properties, accurate dosages are critical.

### 3. Defendants administer unauthorized drugs

Though lidocaine is not authorized by the protocol, MDFL-ECF 48-1, Defendants' records demonstrate that injectable lidocaine was removed from the

pharmacy and taken to FSP on multiple occasions. MDFL-ECFs 48-2 at 16; 48-8 at 27. While Marcano surmised that lidocaine was kept on a cart at FSP in case the need for a cutdown procedure arises, EH 247, her explanation was not due to personal knowledge and did not account for discrepant amounts. EH 249.

Almgren's testimony established that the use of drugs not provided for in the protocol "could lead to medication error" because there is simply no guidance on "how much you would use, how would you use [it]," or "when do you use it." EH 35. All drugs should be specified in the protocol because, without that guidance, "[t]here's just no information." EH 35. Zivot testified that liquid lidocaine "can actually cause a seizure sometimes, depending on how much is given and where it's given." EH 102. An ad hoc addition of such a drug to the wrong prisoner could be "life-threatening" on its own if it caused an allergic reaction, for example. EH 103.

Lidocaine's use in executions, despite its absence from the protocol, warrants further inquiry, particularly considering the limited information Guardado had. The district court abused its discretion in discounting Guardado's complaint altogether, despite testimony describing the dangerous effects of lidocaine and the uncertainty regarding the extent to which it has been used in executions.

**4. Defendants' documented administration of expired drugs**

It is undisputed that Defendants' own records document the use of expired etomidate during multiple executions. Yet, despite on-going litigation, Defendants

chose to Wite-Out their records to alter numerous entries of expired etomidate spanning months—changing the expiration date from 1/31/2025 to 1/31/2027 without noting why or how the incorrect date was logged originally. MDFL-ECF 48-8 at 8. Despite Defendants' attempts to limit the scope of the hearing to four Wite-Out events, MFDL-ECF 23, records reveal this happened six times. MFDL-ECF 48-8 at 8. Defendants' attempts to obfuscate this issue should not be rewarded.

Marcano's inquiry into the violations was limited to the timeframe addressed in *Walls v. Dixon*, *et al.*, No. 4:25-cv-00488-MW-MAF, ECF 1 (N.D. Fla. Nov. 26, 2025), despite her claim she was unaware of pending litigation. This period ended September 30, 2025. EH 221 (Marcano explaining the errors came to her attention in December or January). She apparently did not investigate what occurred after that date, beyond applying Wite-Out to entries of expired etomidate corresponding with the Samuel Smithers and Norman Grim executions that occurred in October 2025. MDFL-ECF 48-8 at 8. Marcano's only explanation for the repeated documented use of expired drugs was that a person working in the pharmacy did not speak English as their first language, thus erred in writing down the year. EH 233. She did not explain why a person who, due to a language barrier, would misunderstand years would be employed there or why this error was not caught by any other person prior.

Almgren noted the "particularly disturbing" nature of the entries occurring on six separate occasions, without sufficient explanation of when or why the dates were

changed: "if . . . there was only one [erroneous] entry . . ., then you would think that when [FDOC] made the next entry on August 29th" that they would notice the logging of expired drugs. EH 39. "But this kept on going and it did not seem to catch anybody's attention." EH 39. She noted that Wite-Out is "completely inappropriate in proper recordkeeping[,]" EH 40, and this practice implicates the reliability of Defendants' recordkeeping as a whole: "I would be very wary and concerned with these records because there are a number of corrections. And, in particular, that Wite-Out practice is just absolutely terrible[.]" EH 44. Defendants' practice of simply erasing evidence of discrepancies raises fundamental concerns about the FDOC pharmacy.

Carefully tracking etomidate expiration dates is critical because the drug "can lose potency," meaning it "may not be at the strength" contemplated for use in the protocol, EH 27, and begin to operate as a different drug altogether: "[i]t may change pH, so it will become more acidic or it may become more basic. And that, of course, will impact how it will be absorbed and how it will react within [a prisoner's] body. It can precipitate . . . . Sometimes the molecule itself, the active ingredient, will degrade." EH 27.

Furthermore, the district court's focus on verifying whether expired drugs were used in specific executions missed the broader context of Guardado's claim,

which is that the months-long, pervasive, and well-documented maladministration in multiple respects creates a substantial risk of serious harm.

**5. Unexplained discrepancies in toxicology results**

The toxicology records and expert testimony further support the substantial risk of harm to Guardado. While the district court relied on Dr. Webb's testimony that several factors unrelated to the potency of etomidate could explain the discrepancy in the postmortem blood levels of Michael Bell and Samuel Smithers, such as a difference in blood draw locations, MDFL-ECF 63 at 44, the court did not address the notable variance in postmortem etomidate levels recorded among peripheral blood samples. EH 141.

Even accounting for individuals' differing physical compositions or medical statuses, Zivot concluded that there should be more consistency between postmortem etomidate levels in blood drawn from the same location. EH 141. Though Webb acknowledged that peripheral blood draws are the "gold standard" for postmortem testing, EH 171, as they minimize the effects of postmortem redistribution and are a "more reliable number[] in terms of what is accurate to life, or at the time of death," EH 182-83, Webb did not explain the disparate postmortem etomidate levels among peripheral blood samples, such as the discrepancy between Kayle Bates' femoral blood level, 0.22 mcg/mL (below the level recommended by the manufacturer to induce "basic entry-level hypnosis"), MDFL-ECF 33-6 at 6; EH

115, and Samuel Smithers' peripheral iliac vein level, 0.13 mcg/mL. MDFL-ECF 33-10 at 8.

This discrepancy is significant to determine whether, at the time of execution, there existed even a basic entry-level of hypnosis or whether the individual experienced pain and terror while suffocating. Zivot explained that to achieve the state of unawareness or painlessness intended for execution, likely a level greater than 0.23 mcg/mL would be needed. EH 115, 120. And, while the recommended 0.23 mcg/mL level relates to blood plasma, EH 128, whole blood postmortem levels are likely a close approximation of premortem plasma levels, given the stability of etomidate postmortem which would not likely degrade for approximately a week after execution,[2] EH 133-34, because etomidate breaks down via the liver, which ceases functioning upon death. EH 140-41. Among the execution autopsies he reviewed, Zivot noted approximately one third had levels below 0.23 mcg/mL, EH 120, a level inadequate to accomplish "the kind of pain control that I think you would need" to prevent both the sensations of conscious suffocation and pain. EH 121.

The district court accepted Webb's testimony that etomidate continues degrading after death and that whole blood and plasma levels are incomparable. This was despite Webb's repeated concessions that he does not know how fast or slow

[2] Webb testified that following an execution, a body would arrive at his office within two to three hours, at which point it would be refrigerated, and a postmortem examination would occur first thing in the morning. EH 179-80.

etomidate degrades postmortem, MDFL-ECF 54 at 175, or "at what point the cellular processes will shutdown," MDFL-ECF 54 at 183. He does not deal with blood plasma or know the difference in the etomidate levels between plasma and whole blood, EH 174, 178, and has never investigated whether premortem and postmortem etomidate levels would approximate, EH 176. Webb even admitted that he did not consult with a pharmacologist, pharmakinetics specialist, or anesthesiologist, EH 188-89, nor was he qualified to administer anesthesia. EH 187, 193.

### C. Defendants should not be presumed to comply with the protocol

Given the myriad, and serious, discrepancies outlined, the district court abused its discretion in affording FDOC the presumption that it would comply with its protocol. Defendants cannot be trusted to carry out Guardado's execution in a manner that comports with the Constitution. The documented pattern of pervasive maladministration is overwhelming. Even if in-camera review of selected records revealed that some Wite-Out was in fact correcting dates to make them accurate, the practice of repeatedly logging incorrect information creates a substantial risk that other errors are occurring.

Inaccurate record-keeping patterns demonstrate deeper flaws—and greater risk—in administering the protocol. Almgren testified that baseline pharmaceutical ethics and standards require that "[r]ecords should reflect your practice." EH 42. Marcano's excuses and assurances that, contrary to those records, executions have

been and will continue to be carried out properly should not be credited, particularly when she admitted there was no objective basis for her beliefs. *See, e.g.*, EH 240.

There was no investigation beyond Marcano's internal review. This lack of transparency makes it "difficult . . . to trace back . . . who made the correction or who made the note, who actually received the drugs and who wrote them in." EH 29. Marcano's explanations, or lack thereof, were an appeal to blindly trust that FDOC officials are following the protocol, even in the face of contrary evidence. The district court should not have accepted Marcano's unsupported vouching for FDOC staff, when the totality of the record shows a lack of investigation, lack of explanation, and a reckless disregard for established pharmaceutical standards.

The district court similarly should not have credited FDLE monitors Adam Graff and Kevin James' testimony in light of their blatant inconsistencies. FDLE monitors gave no explanation for the errors because they denied any occurred, with Graff instead calling the execution process "one of the most professional operations I've seen." EH 148. But they revealed that their only training is reading the protocol and "on the job" by serving on an execution team. EH 203-04; *see also* EH 155. But even their practice run does not simulate filling syringes or checking expiration dates—some of the most critical acts in question here. EH 157-58, 204-05; MDFL-ECF 33-1 at 17; 33-2 at 16; 33-3 at 17; 33-4 at 16; 33-5 at 17. Graff further testified that FDLE monitors are not chosen for any special qualifications, other than

proximity to FSP. EH 154-55. And James's testimony demonstrated one of the problems Guardado has noted; he first claimed an execution drug was unexpired upon use, but when asked on cross about that same drug, gave an expiration date prior to the execution. *Compare* EH 200-01, *with* EH 206.

None of the witnesses tasked with ensuring protocol compliance had sufficient answers to excuse the pervasive problems here. The district court abused its discretion in affording Defendants the benefit of presumption.

### D. The district court abused its discretion by curtailing the process and factfinding in Guardado's suit and then faulting Guardado for failing to prove his case

As a result of the truncated process and factfinding created by the State's signing of his death warrant, Guardado's claim necessarily pointed to just a fraction of FDOC's drug records. Even that snapshot of records showed multiple serious problems with how FDOC was routinely failing to follow its lethal-injection protocol and demonstrated concrete evidence of an objectively intolerable risk of harm. Yet, because FDOC then ceased providing further information, Guardado's claim necessitated further discovery and inquiry into FDOC practices. The district court abused its discretion by failing to allow that process.

While the district court held a compressed evidentiary hearing and conducted an in-camera review of some expiration logs, Guardado's other reasonable discovery requests were never granted, MDFL-ECF 30, and the hearing raised more questions

than answers in light of significant new information that was revealed about FDOC's execution and pharmaceutical practices. Guardado should have been allowed to amend and develop the record further. The district court abused its discretion by curtailing the process, then blaming Guardado for failing to carry his burden.

**III. Guardado also satisfies the remaining stay factors**

The remaining stay factors also weigh in Guardado's favor. First, he will suffer an irreparable injury absent a stay because he faces a substantial and imminent risk of being executed in a manner that wantonly inflicts pain and suffering in violation of the Eighth Amendment. Irreparable injury is presumptive under warrant. *See, e.g.*, *Lee*, 2026 WL 1741802, at *7 ("It goes without saying that [a plaintiff] would suffer irreparable harm if he were executed pursuant to a method that the district court has found unconstitutional. To him, loss of life is not compensable by legal remedies like damages."); *Wainwright v. Booker*, 473 U.S. 935, 937 n.1 (1985) (Powell, J., concurring) ("The third requirement that irreparable harm will result if a stay is not granted is necessarily present in capital cases."); *In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003) ("We consider the irreparability of the injury that petitioner will suffer in the absence of a stay to be self-evident."); *Ferguson*, 493 F. App'x at 26 (Wilson, J., concurring) ("As a general rule, in the circumstance of an imminent execution, this court presumes the existence of irreparable injury.").

The irreparable injury in a case challenging a method of execution is not only the execution itself, but also the superadded pain that would occur during that execution. *See Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala. May 16, 2011), *aff'd*, 641 F.3d 1255 (11th Cir. 2011) (finding "the alleged irreparable injury is not the fact alone that [plaintiff] will die by execution" but that he may experience superadded pain "under present protocols" during that execution) (citing *Baze*, 553 U.S. at 50). This is not only because the pain during execution may be torturous, but also because a violation of constitutional rights is presumed to cause irreparable injury. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

Next, a stay would not substantially harm the State. While the State has an interest in the timely enforcement of valid criminal judgments, it has no legitimate interest in executing Guardado via a method that risks the wanton infliction of pain or suffering in violation of the Eighth Amendment. *See, e.g.*, *In re Holladay*, 331 F.3d at 1177 (finding "no substantial harm that will flow to the State of Alabama or its citizens from postponing petitioner's execution to determine whether that execution would violate the Eighth Amendment").

That is particularly true here, where it was the State's actions that caused the exigency by signing Guardado's death warrant a week after he filed a § 1983 action, which the State knew was pending. In Florida, there are dozens of warrant-eligible prisoners, many of whom have no pending litigation. Nonetheless, the State selected

Guardado. The State's efforts to short-circuit Guardado's litigation by signing his death warrant further shift the balance of the equities in his favor.

Finally, a stay would not be adverse to the public interest, which is served by allowing meaningful judicial review of the significant constitutional concerns Guardado has raised regarding Defendants' maladministration of the lethal-injection protocol. The public always has an interest in the preservation of constitutional rights and in the humane and dignified carrying out of a death sentence. *See Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986) (The Eighth Amendment seeks "to protect the dignity of society itself from the barbarity of exacting mindless vengeance" when carrying out an execution). Particularly here, the people of Florida have a vested interest in learning what is causing the routine errors in handling execution drugs within the DOC and the other deviations from the protocol that Guardado alleged. The State's action of signing Guardado's death warrant, with the effect of curtailing this inquiry through his execution, is antithetical to that interest—certainly, more than any minimal delay that may result from granting a stay.

## IV. Conclusion

The Court should grant a stay of execution to allow for further proceedings.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
Chief, Capital Habeas Unit
/s/ Sean Gunn
SEAN GUNN
Assistant Federal Public Defender
Northern District of Florida
227 North Bronough St., Suite 4200
Tallahassee, Florida 32301
(850) 942-8818
linda_mcdermott@fd.org
sean_gunn@fd.org

*Counsel for Mr. Guardado*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted in Rule 32(f) and Rule 27(a)(2)(B), it contains 4,787 words.

This document also complies with the typeface requirements of Rules 27(d)(1)(E) and 32(a)(5), and the type-style requirements of Rules 27(d)(1)(E) and 32(a)(6), because it uses a proportionally spaced 14-point font (Times New Roman).

/s/ Sean Gunn
SEAN GUNN

## CERTIFICATE OF SERVICE

On October 31, 2026, this document was served electronically through the CM/ECF filing system.

/s/ Sean Gunn
SEAN GUNN