In the

# United States Court of Appeals

For the Eleventh Circuit

---

No. 26-14027

---

JESSE GUARDADO,

*Plaintiff-Appellant,*

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,
WARDEN, FLORIDA STATE PRISON,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:26-cv-02596-MMH-SJH

---

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and LUCK, Circuit Judges.

BY THE COURT:

On September 13, 2004, while he was on conditional release from an earlier stint in prison for armed robbery, Jesse Guardado beat Jackie Malone with a breaker bar and stabbed her with a knife, again and again and again, until she was dead so he could rob her

and buy crack with the loot he stole. *Guardado v. Sec'y, Fla. Dep't of Corr.*, 112 F.4th 958, 962–63 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025). Guardado's guilt was never in doubt. He confessed and pleaded guilty. *Id.* at 963–64.

After a penalty phase, the state trial court, following the jury's unanimous recommendation, sentenced Guardado to death. *Id.* at 964–73. His direct appeals were denied. *See Guardado v. State*, 965 So. 2d 108 (Fla. 2007), *cert. denied*, 552 U.S. 1197 (2008). And his state and federal postconviction challenges were also rejected. *See Guardado v. State*, 176 So. 3d 886 (Fla. 2015); *Guardado v. State*, 238 So. 3d 162 (Fla. 2018); *Guardado*, 112 F.4th at 995; *Guardado v. State*, —So. 3d—, 2026 WL 3267707 (Fla. Oct. 29, 2026).

More than twenty years after his death sentence, and on the cusp of his execution on November 5, 2026, Guardado sued the Secretary of the Florida Department of Corrections and the Warden of Florida State Prison under 42 U.S.C. section 1983, claiming that the method the state will use to execute him violates his Eighth Amendment right to be free from cruel and unusual punishment. The state's lethal-injection protocol, Guardado alleged, is supposed to be administered in three stages. First comes a large dose of etomidate, which is a sedative that renders the prisoner unconscious and insensate to pain. Next is rocuronium bromide, which is a paralytic agent that keeps the prisoner from moving. The last drug is potassium acetate, which causes cardiac arrest.

Guardado alleged that, in one of five ways, there's a substantial risk the state will fail to administer properly this lethal-injection

protocol: (1) the state will not use etomidate during the execution; (2) the state will use an insufficient amount of etomidate; (3) the state will use an expired dose of etomidate; (4) the state will use insufficient doses of the other two drugs; and (5) the state will use drugs that are not part of the protocol. As a result, Guardado alleged that there's a substantial risk he will consciously suffocate during the execution, which would be cruel and unusual under the Eighth Amendment. Along with his complaint, Guardado moved to stay his execution while his method-of-execution claim was pending.

The district court ordered limited discovery on the expired etomidate issue and held an evidentiary hearing on the stay motion. After the hearing, the court denied the motion because Guardado was not likely to succeed on the merits of his Eighth Amendment method-of-execution claim. "His concern regarding the potential use or future use of expired etomidate" was "not supported by the evidence," the district court explained. "And his various other concerns [were] far too speculative to support a finding that [the state's] planned execution protocol present[ed] a risk that [was] sure or very likely to cause serious illness or needless suffering."

Guardado has appealed the denial of his stay motion. And he has moved for a stay of execution pending his appeal. We take up that motion now.

**I.**

"To obtain a stay of his execution pending appeal," Guardado "must show that '(1) he has a substantial likelihood of success on the merits' of his appeal, '(2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest.'" *See Humphreys v. Comm'r, Ga. Dep't of Corr.*, 161 F.4th 1300, 1306 (11th Cir. 2025) (quoting *James v. Sec'y, Dep't of Corr.*, 130 F.4th 1291, 1295 (11th Cir. 2025)). We start with the first stay factor.

**II.**

"A death row inmate may attempt to show that a [s]tate's planned method of execution, either on its face or as applied to him, violates the Eighth Amendment's prohibition on 'cruel and unusual' punishment." *Nance v. Ward*, 142 S. Ct. 2215, 2219–20 (2022). "To succeed on that claim . . . he must satisfy two requirements." *Id.* at 2220. "First, he must establish that the [s]tate's method of execution presents a 'substantial risk of serious harm'—severe pain over and above death itself." *Id.* (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015)). Second, "he 'must identify an alternative [method] that is feasible, readily implemented, and in fact significantly reduce[s]' the risk of harm involved." *Id.* (alterations in original) (quoting *Glossip*, 576 U.S. at 877).

**A.**

As to the first requirement, Guardado argues that there's a substantial risk the state will improperly apply its lethal-injection

protocol during his execution. This will happen in one of five ways, he says: (1) the state will not administer etomidate; (2) the state will not administer enough etomidate to render him unconscious; (3) the state will use expired etomidate; (4) the state will use insufficient dosages of the other two drugs in the protocol; and (5) the state will use unlisted drugs in addition to the three called for under the protocol. Misapplying the protocol, Guardado contends, will result in a substantial risk that he will consciously suffocate.

Guardado has not met his burden on the first method-of-execution requirement. As to each alleged misapplication, the district court found that there was no substantial likelihood that Guardado was "sure or very likely" to experience needless suffering. Having carefully reviewed the record, we believe these findings were not clearly erroneous. *See Brooks v. Warden*, 810 F.3d 812, 824 (11th Cir. 2016) (reviewing findings made by the district court in denying a stay of execution for clear error); *Grayson v. Allen*, 491 F.3d 1318, 1324–25 (11th Cir. 2007) (same).

**1.**

Guardado first contends the state will not use etomidate during his execution. In support, he points to the drug log entries for three prisoners—Thomas Gudinas, Michael Bell, and Edward Zakrzewski—showing no documented removal of etomidate from the state's pharmacy for their executions. From this, Guardado assumes that the three prisoners must not have been administered etomidate during their executions. And, he argues, there's a substantial risk the same will happen to him.

But Guardado's assumption is off. The district court found that the three prisoners did receive etomidate during their executions and the drug log entries were merely recordkeeping errors. Its finding was well supported by the evidence. *See Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 896 (11th Cir. 2024) (Under "clear error review," "a finding 'that is plausible in light of the full record—even if another is equally or more so—must govern.'" (quoting *Cooper v. Harris*, 581 U.S. 285, 293 (2017))). Agent Adam Graff, a state law enforcement officer who participated in Bell's execution, testified that etomidate was administered. And the post-execution toxicology reports for the three prisoners undisputably showed that they had etomidate in their blood after the executions. That could only have come from administration of etomidate during their executions. So, we know as a scientific fact that they received the first drug in the protocol.

**2.**

Next, Guardado asserts that the state will not give him enough etomidate to render him unconscious, which means there's a substantial risk he will consciously suffocate as the other two drugs are administered. He cites the post-execution toxicology reports of two prisoners—Bell and Samuel Smithers—which show a tenfold disparity in post-mortem etomidate levels between them. And he points to disparities (albeit much smaller) in the post-execution toxicology reports of other prisoners. Guardado contends that the lower blood levels show that the prisoners received less

etomidate than would be necessary to render them unconscious during their executions.

Guardado's contention assumes that the prisoners' post-mortem blood levels would have been similar to the etomidate in their blood at the time of their executions. Yet the science does not back up his assumption. As the district court observed, the etomidate level to render someone insensate and unconscious is measured based on plasma blood. But the toxicology reports Guardado relies on measured "whole blood," which is "'absolutely not' a one-to-one measurement." The comparison fails out of the gate.

And as the district court further found, post-mortem blood levels don't tell us much about the drug levels at the time of the execution because, even after death, drugs redistribute and metabolize in the body, which impacts toxicology blood levels that are taken hours later. The record evidence supports this finding. Guardado's medical expert conceded that "[p]ost[-]mortem drug redistribution [*i.e.*, circulation] is well known, and post[-]mortem drug concentrations may be unreliable proxies for circulating blood levels while alive." And the state's medical expert explained that post-mortem readings do not reflect conditions during the execution because etomidate continues circulating and degrading in the blood for some period after death. Post-mortem etomidate levels also depend on individual prisoners' unique "physiological makeup," like their metabolisms, health conditions, and body compositions, making comparisons between individuals even more difficult.

**3.**

Guardado also maintains that the state will likely use expired etomidate during his execution. He relies on drug log entries showing that expired etomidate was used in six executions in 2025. Expired etomidate loses its potency, he explains, which creates a substantial risk that it will be ineffective to render him unconscious during the execution.

But the district court found these entries were also record-keeping errors, and the record supports this finding. The state's chief of pharmaceutical services, Dr. Renea Marcano, testified that the 2025 expiration dates on the logs were mistaken. The expiration dates should have been listed as January 2027 because that is when the etomidate will actually expire. Two law enforcement officers, Agent Graff and Agent Kevin James, saw the vials of etomidate before they were administered in five of the six executions and the agents confirmed that they were not expired. And the state's receipts and lot numbers for its stock of etomidate showed that the etomidate used in the six executions had an expiration date of January 2027. In fact, the state never had etomidate with a January 31, 2025 expiration date, as the mistaken entries had shown.

As to Guardado's execution, specifically, Dr. Marcano averred that she had set aside the proper dose of etomidate, and the

expiration date was January 2027. So, there is no substantial likelihood that the state will use expired etomidate for his execution.[1]

**4.**

Additionally, Guardado contends that there's a substantial risk he will not receive proper doses of the other two drugs in the lethal-injection protocol. In support, he highlights the drug log entries showing the doses of rocuronium bromide and potassium acetate withdrawn for the executions of two prisoners—Anthony Wainwright and Gudinas—were less than the amount required by the protocol.

But as the district court found, there was no substantial risk of serious harm to Guardado from the lower doses of the other two drugs because the etomidate would render him insensate during his execution. He would never know he received less of the other two drugs than he was supposed to because he would be deeply unconscious (based on the amount of etomidate the prisoner is given under the protocol).

Guardado speculates that "an insufficient dosage of one drug could lead to unnecessary suffering from another," but there's no evidence in the record to support his speculation. And even if there were evidence to support it, Guardado has to show a substantial

[1] The district court also found that, at best for Guardado, expired etomidate has only the "potential" to degrade, which was insufficient to show a substantial risk of serious harm. Guardado does not address this finding in his stay motion.

risk of serious harm. *See Glossip*, 576 U.S. at 877. Could is not enough.

**5.**

Finally, Guardado argues that there's a substantial risk the state will use lidocaine (a drug not listed in the protocol) during his execution, in addition to the other three drugs in the protocol. He draws this inference from the state's drug logs, which show that lidocaine was removed from the pharmacy and taken to the prison where the state conducts the executions.

But as the district court found, Guardado "fail[ed] to present evidence to support th[e] notion" that the state's "rare use of lidocaine" would "cause needless suffering." Dr. Marcano testified that lidocaine is used only if the state needs to get access to a prisoner's vein through a cutdown procedure as outlined in the lethal-injection protocol. The lidocaine, which is a local anesthetic, is on the medical cart in the execution chamber in case the cutdown happens.

But the state has not "done a cutdown in a long time." And Agent Graff testified that in all the thirteen executions he's witnessed, he had never seen lidocaine used in an execution. There is no evidence—and Guardado does not argue—that he will need a cutdown procedure for his execution. So, there is no substantial likelihood that lidocaine will be used on him. In any event, while Guardado's expert witnesses testified that using lidocaine "could" lead to seizures and other life-threatening conditions, the unspecified chance that lidocaine could cause a problem for some prisoners

is not enough to show a substantial risk of that result as required under the Eighth Amendment. Guardado has not shown a substantial likelihood of success on the first requirement of his method-of-execution claim.

**B.**

And his stay motion is silent on the second requirement. To obtain a stay on a method-of-execution claim, Guardado has the burden to show a substantial likelihood that there's a feasible, readily implemented, alternative method-of-execution that will significantly reduce the substantial risk of serious harm from the maladministration of the lethal-injection protocol. *See Nance*, 142 S. Ct. at 2220. Guardado submitted a firing squad as his preferred alternative below. But his stay motion doesn't mention anything about a feasible and readily implemented alternative method of execution. Not once. Nor does it explain why his failure to proffer an alternative is excusable. This failure to address a necessary element of his claim is fatal to a stay.

**C.**

While he doesn't mention the second requirement of his method-of-execution claim, Guardado does make an additional argument for why he's entitled to a stay. The district court, he contends, curtailed the discovery process and held a compressed evidentiary hearing, which made it hard to carry his burden.

But "[a] district court has wide discretion in discovery matters and our review is accordingly deferential." *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1304 (11th Cir. 2016) (quoting

*Bradley v. King*, 556 F.3d 1225, 1229 (11th Cir. 2009)). "[A] district court's denial of additional discovery must result in substantial harm to a party's case in order to establish an abuse of discretion." *Id.* (quoting *Bradley*, 556 F.3d at 1229).

There is no substantial harm here. The district court allowed limited discovery on the state's use of expired etomidate, requiring the state to turn over updated drug logs showing drug names, withdrawal dates, and expiration dates through the present. And even before that order, the state had already filed as exhibits state execution checklists and autopsy/toxicology reports for a number of prisoners, and had filed a list of expert and fact witnesses who would speak to execution protocol and pharmaceutical recordkeeping. The district court later ordered the state to submit for in camera review unredacted drug logs showing the lot and invoice numbers from when the state purchased the etomidate. And it held an evidentiary hearing where Guardado had the opportunity to present the testimony of two expert witnesses and to cross-examine the state's expert and fact witnesses.

Other than arguing that his "claim necessitated further discovery and inquiry into [the state's] practices," Guardado does not detail the substantial harm he suffered from the district court's discovery rulings.[2] "Considering the district court's broad discretion,

[2] In his reply in support of the stay motion, Guardado reiterates that he "learned additional new facts that . . . called for further development." But other than referencing the use of lidocaine—which he already knew about and

we cannot say its decision about discovery resulted in substantial harm to [Guardado's] case." *See id.* at 1305 (citation modified).

**III.**

The other factors also weigh against staying Guardado's execution. "[B]efore granting a stay of execution, a court must 'consider not only the likelihood of success on the merits . . . but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019) (quoting *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)). "There is a 'strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Id.* (quoting *Nelson*, 541 U.S. at 650).

Here, Guardado could have raised his method-of-execution claim at least nine months earlier when Frank Walls brought a similar Eighth Amendment claim based on some of the same records that Guardado relies on.[3] He could have raised his claim eight

---

was alleged in his complaint—he doesn't explain what the further development would show.

[3] In his reply, Guardado argues that he filed his method-of-execution claim "at the earliest opportunity, just weeks after he became warrant-eligible." But Guardado is mistaken. In Florida, a prisoner sentenced to death is "warrant-eligible" after initial state and federal postconviction proceedings are completed. *Cf. Silvia v. State*, 228 So. 3d 1144, 1146 (Fla. 2013) ("The transcript further reflects that Silvia understood that if the court granted his request to discharge his attorneys and waive postconviction proceedings, he would become warrant-eligible—that is, the governor could sign a warrant for his execution."); *Jones v. State*, 419 So. 3d 619, 625–26 (Fla. 2025) ("[T]he Clerk of this

months earlier when Ronald Heath brought a similar method-of-execution claim in state court based on similar evidence. *See Heath v. State*, 426 So. 3d 1253, 1261–62 (Fla. 2026) (describing similar claim). And he could have raised his claim seven months earlier when Melvin Trotter brought a similar claim in state court based on similar evidence. *See Trotter v. State*, 428 So. 3d 68, 71–73 (Fla. 2026) (describing a similar claim). Instead, Guardado delayed more than half-a-year before raising his method-of-execution claim.

"We have refused to grant stays in cases involving delayed filings before, and [Guardado's] delay was even more pronounced and less justifiable." *See Long*, 924 F.3d at 1178 (citing *Brooks*, 810 F.3d at 826; *In re Hutcherson*, 468 F.3d 747, 749–50 (11th Cir. 2006); *Diaz v. McDonough*, 472 F.3d 849, 851 (11th Cir. 2006); *Jones v. Allen*, 485 F.3d 635, 640 (11th Cir. 2007)). We refuse to do so here as well.

Guardado argues that we shouldn't refuse because the state didn't move forward with the execution warrant until after he filed his claim. But pointing to when the state issued the warrant

---

Court certified to the Governor on October 4, 2013, that Jones had completed his direct appeal and initial postconviction proceedings in state court and his habeas corpus proceedings and appeal therefrom in federal court. Thus, in addition to the thirty-two years of notice since the imposition of his death sentences, Jones has been on notice for nearly twelve years that he is 'warrant-eligible,' meaning 'the [G]overnor could sign a warrant for his execution.'" (citation modified)). Guardado became warrant-eligible in 2025 when the Supreme Court denied certiorari review in his federal postconviction appeal. *See Guardado*, 145 S. Ct. at 2822. In any event, the accrual of Guardado's method-of-execution claim—which is when he could have brought his claim—is not the same as his warrant-eligibility.

doesn't answer or explain why he delayed nine months to bring his claim. Because he offers no explanation, we should apply the strong equitable presumption against granting the stay.

"The remainder of the factors we apply when considering a stay amount to a weighing of the equitable interests of [Guardado], the [state], and the public." *See Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 701 (11th Cir. 2019). On the state and the public's side of the scale, "the Supreme Court has recognized [that] the state, the victim, and the victim's family . . . 'have an important interest in the timely enforcement of [Guardado's] sentence.'" *See Brooks*, 810 F.3d at 825 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). "[E]quity must be sensitive to the [s]tate's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 584. For that reason, "we have rejected the argument that" a prisoner "will suffer irreparable harm if he is executed, whereas the state will only suffer a minimal inconvenience, because the state, the victim, and the victim's family also have an important interest in the timely enforcement of [the prisoner's] sentence." *Bowles v. DeSantis*, 934 F.3d 1230, 1247–48 (11th Cir. 2019) (citation modified).

**IV.**

Because Guardado has not shown a substantial likelihood that he will prevail in his appeal, and the other equitable factors

caution against granting a stay, we DENY his motion for a stay of execution.[4]

**MOTION DENIED.**

---

[4] We GRANT Guardado's motion to proceed in forma pauperis.

JILL PRYOR, Circuit Judge, Concurring:

So far this year, Florida has executed eighteen prisoners. Later this week, it plans to execute Jesse Guardado. It plans to carry out his execution using the same protocol it used for its other executions this year. During the execution, Florida will administer to Mr. Guardado three drugs: etomidate (a sedative), rocuronium bromide (a paralytic agent), and potassium acetate (which causes cardiac arrest).

Before Florida obtained a warrant to execute Mr. Guardado, he filed a lawsuit in federal court making a constitutional challenge to his execution. The primary basis for his method-of-execution challenge was his claim that Florida had used expired etomidate in earlier executions and would use the expired drug for his execution, which would result in him being awake and aware during the administration of the other two drugs.

The basis for Guardado's troubling allegations was, at least in part, inventory records from the Florida Department of Corrections. The Department's Chief of Pharmacy Services oversees the storage of the drugs used in executions and maintains logs concerning the storage of each drug. When the Department acquires a supply of one of the drugs, it records on a log the date it acquired the drug, the vendor who provided the drug, the lot number of the drug, the expiration date of the drug, and the quantity of the drug. The log is also supposed to reflect each time the Department uses any of its inventory of a drug, such as when it carries out an execution. It is undisputed that the logs the Department maintained

showed that Florida had used expired etomidate in several previous executions and, for three more executions, included no entries showing that it had used any etomidate at all.

After discovery and an evidentiary hearing on Mr. Guardado's claim, the district court found that the Department was not using expired etomidate or failing to administer the drug at all. Based on its findings of fact, the district court correctly concluded that Mr. Guardado has not shown a substantial likelihood of success on the merits of his method-of-execution claim. I agree with the majority that based on the district court's fact findings, which are not clearly erroneous, Mr. Guardado is not entitled to a stay of his execution. Accordingly, I join parts I, II.A, II.C, and IV of the Court's order.[1]

Still, this case has brought to light concerning facts about the Florida Department of Corrections' failure to maintain accurate records for drugs used in its executions. We now know that the Department of Corrections was not taking care to ensure that its logs contained accurate information. Testimony from the evidentiary hearing showed that the person preparing the logs improperly recorded the expiration date of the etomidate because English was not his first language, and he did not understand that the log was requesting the expiration date for the drug, not the current year.

---

[1] I do not join parts II.B or III, which address whether Mr. Guardado has shown a feasible alternative method of execution and whether factors other than substantial likelihood of success on the merits support a stay, respectively. It is unnecessary to address these issues to decide the appeal before us.

But even more concerning is Florida's response once it learned during litigation about the errors in its drug log. When the Department realized that its logs contained inaccurate information about drug expiration dates, its solution was to use Wite-Out liquid eraser to alter the logs. It did not make any attempt to document either in the log or elsewhere that a change had been made to the log, when the change was made, who made the change, or why the change had been made. The evidence in this case shows that these types of untraceable edits to a log tracking the storage of a drug is "completely inappropriate" and indeed "invalidates the point[] of the records," which should be a contemporaneous record of each drug that was acquired and used. Doc. 54 at 30, 41.[2]

Although the recordkeeping failures in this case do not rise to the level of a constitutional tort, the State's lack of transparency and failure to maintain accurate records is deeply concerning. It would be troubling if a State pharmacy failed to adequately track the storage of drugs in its possession. But, here, the failure occurred with the storage of drugs used to carry out executions. In this context, a State must maintain accurate and thorough records of its practices to be able to demonstrate that it is carrying out executions according to its protocols and in compliance with the Constitution. As Justice Sotomayor recently emphasized in another Florida case, such records are needed to "instill[] confidence in the [execution] protocol for everyone—prisoners, the courts, and the public alike." *Trotter v. Florida*, 146 S. Ct. 755, 756 (2026)

[2] "Doc." numbers refer to the district court's docket entries.

(Sotomayor, J., statement respecting the denial of the application for stay of execution and denial of certiorari). And, as this case demonstrates, a State's failure to maintain accurate records will invariably lead to concerns and questions about whether the State is adhering to its protocol as well as the efficacy and constitutionality of that protocol.

One final note. Our conclusion today that Mr. Guardado is not entitled to a stay of execution should not in any way signal or suggest that we condone the Department of Corrections' failure to meet its basic responsibility to maintain accurate records.